IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CATHAY INDUSTRIES USA, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 16 C 2070 |
| v. | ) | |
| | ) | Magistrate Judge |
| WILLIAM J. BELLAH, | ) | Maria Valdez |
| | ) | |
| Defendant. | ) | |
| | ) | |

# MEMORANDUM OPINION AND ORDER

Plaintiff Cathay Industries USA, Inc.'s ("Cathay") complaint, which is premised on diversity jurisdiction, alleges breach of contract due to Defendant William J. Bellah's failure to pay sums due under a promissory note. Cathay has moved for summary judgment on Bellah's Third Affirmative Defense, which alleges that the obligation was satisfied and released. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons that follow, Plaintiff's Motion for Partial Summary Judgment [Doc. No. 33] is denied.

## FACTS[1]

Cathay is a manufacturer of synthetic iron oxide pigments. (Pl.'s LR 56.1(a)(3) ¶ 5.) Bellah founded Compass Chemical International, LLC ("Compass") in around 1999. (Pl.'s LR 56.1(a)(3) ¶ 5; Def.'s LR 56.1(b)(3)(C) ¶ 1.) Shortly

---

[1] Unless otherwise noted, the following material facts are undisputed or are deemed admitted due to a party's failure to comply with Local Rule 56.1, which this Court strictly enforces.

1

thereafter, Bellah met and began working with Terence Yu, who was the CEO of Cathay's owner at the time, Cathay Pigment Holdings ("Holdings"). (Def.'s LR 56.1(b)(3)(C) ¶¶ 2-3.) In 2007, Cathay acquired Compass. (Pl.'s LR 56.1(a)(3) ¶ 5.) As a result of that sale, Bellah incurred certain tax obligations, which Compass sought to alleviate by issuing him a $1.5 million promissory note (the "Compass Note"). (*Id.* ¶ 6; Def.'s LR 56.1(b)(3)(C) ¶ 4.) The Compass Note was executed on September 23, 2008 and required annual payments starting September 15, 2009 and ending September 15, 2018. (Pl.'s LR 56.1(a)(3) ¶ 6; Def.'s LR 56.1(b)(3)(B) ¶ 6.)

In 2007, at around the same time as Cathay acquired Compass, Bellah, on behalf of Bel-Air Investments, Inc. ("Bel-Air"), entered into a Consulting Services Agreement with Holdings ("2007 Consulting Agreement"). (Def.'s LR 56.1(b)(3)(C) ¶ 5.) Under the agreement, Holdings agreed to pay Bel-Air for management and sales consulting services over an initial term of five years, in amounts escalating from $20,000 per month to $30,000 per month, with yearly bonuses in amounts starting at $240,000 and ending at $360,000. (*Id.* ¶¶ 6-7.) Under an informal agreement between Holdings and Bellah, half of the bonus payments owed to Bel-Air under the 2007 Consulting Agreement were to be credited toward the amounts Bellah owed under the Compass Note. (*Id.* ¶ 11.) The 2007 Consulting Agreement provided that Bel-Air had the option to renew the contract for an additional five-year term. (*Id.* ¶ 8.) Payments were made to Bel-Air under the initial five-year term and then ceased after the final bonus was paid in the first quarter of 2012. (Def.'s LR 56.1(b)(3)(C) ¶ 9; Pl.'s LR 56.1(a) ¶ 9.)

On October 1, 2011, Cathay divested itself of Compass, transferring all its interest in the company to BMMC Holdings, LLC ("BMMC") in exchange for $15 million, which was paid in the form of another promissory note (the "BMMC Note"). (Pl.'s LR 56.1(a)(3) ¶ 7.) The members of BMMC were Bel-Air (47.5% interest), Cathay Phosphorous Chemical Limited (47.5%), Kevin Miles (2.5%), and Daniel McCaul (2.5%).[2] (Pl.'s LR 56.1(a)(3) ¶ 7; Def.'s LR 56.1(b)(3)(B) ¶ 7; Def.'s LR 56.1(b)(3)(C) ¶ 13.) Under the Compass purchase agreement, Cathay represented that with the exception of contracts listed on an exhibit (which stated "None"), Compass was not a party to or bound by any written or oral "contract to loan money or extend credit to any Person other than trade credit extended in the Ordinary Course of Business." (Def.'s LR 56.1(b)(3)(C) ¶ 15.)

On the same date it sold Compass to BMMC, Cathay entered into a service agreement ("2011 Service Agreement") whereby Cathay would provide certain administrative services to Compass in exchange for a fee. Several months later, on March 19, 2012, the Compass Note was assigned to Cathay as payment for amounts Compass owed to Cathay under the 2011 Service Agreement ("2012 Assignment").

---

[2] Plaintiff's Statement of Facts, supported by an affidavit of Kevin Miles, asserts that Bellah personally was one of the members of BMMC, along with McCaul, Miles, and Cathay Phosphorous. Bellah's response and statement of facts dispute that Bellah was a member, stating that BMMC was owned by McCaul, Miles, Cathay Phosphorous, and Bel-Air. (Def.'s LR 56.1(b)(3)(B) ¶ 5; Def.'s LR 56.1(b)(3)(C) ¶ 13.) The page BMMC operating agreement Bellah cites in support of its response about membership (SC000081) is missing from Exhibit 3. But the previous page, which is the agreement's signature page, includes lines for William J. Bellah, Kevin H. Miles, Daniel McCaul, and Cathay Phosphorous Chemical Limited, and none for Bel-Air. (Def.'s LR 56.1(b)(3)(B) ¶ 7, Ex. 3, at 21 [SC000080].) Nevertheless, Plaintiff did not dispute Defendant's statement of fact regarding BMMC's membership in its response, so the Court will take as true that Bellah was not personally a member of BMMC.

(*Id.* ¶ 17.) The effect of the assignment was that Bellah would owe Cathay instead of Compass any amounts due under the Compass Note. (*Id.* ¶ 17.)

At some point thereafter, BMMC and Cathay decided to terminate their relationship, and on December 31, 2012, BMMC and Cathay entered into a Payoff Agreement. (Pl.'s LR 56.1(a)(3) ¶ 8; Def.'s LR 56.1(b)(3)(C) ¶ 18.) The Payoff Agreement's recitals first reference the Compass purchase agreement and the BMMC Note.[3] The Payoff Agreement goes on to explain that another promissory note, dated December 30, 2012, was executed by Holdings in favor of the following entities or individuals: Bellah as trustee of the Bellah Trust, Bellah individually, McCaul, Miles, and Inter-Orient Holdings, Limited in the principal amount of $15 million (the "Holdings Note"). (Pl.'s LR 56.1(a)(3) ¶ 8, Ex. B.1.) Section 2 of the Payoff Agreement, entitled "Release of BMMC Note Obligations," provides that BMMC and Cathay agree that in exchange for BMMC's transfer and assignment of all rights in the Holdings Note to Cathay, Cathay will discharge BMMC's "obligations and liabilities with respect to the BMMC Note and BMMC Note Obligations," and the BMMC Note will be deemed paid in full and discharged. (*Id.* ¶ 8, Ex. B.1 at 1-2.) Section 3, entitled "Assignment of Cathay Holdings Note," states that "[i]n exchange for Cathay Industries' release, discharge of BMMC with respect to the BMMC Note and BMMC Note Obligations . . . BMMC will transfer and

---

[3] The Payoff Agreement states that the Compass purchase agreement and BMMC Note are dated October 11, 2011, although the undisputed statement of facts lists the date of both as October 1, 2011. (Pl.'s LR 56.1(a)(3) ¶ 7, Ex. B.1.)

4

assign the Cathay Holdings Note . . ." (*Id.* ¶ 8, Ex. B.1 at 2.) The Payoff Agreement's release language, contained in Section 4, states in relevant part:

> [The Cathay Industries Releasing parties] . . . hereby fully, finally and completely RELEASE AND FOREVER DISCHARGE BMMC, and its successor, assigns, . . . officers, shareholders, . . . [collectively the "BMMC Released Parties"] of and from any and all claims, . . . liabilities, obligations, demands, damages, debts, liens, actions and causes of action of any and every nature whatsoever, known or unknown, whether at law, by statute or in equity, in contract or in tort, under state or federal jurisdiction, and whether or not the economic effects of such alleged matters arise or are discovered in the future, which the Cathay Industries Releasing Parties have as of the Effective Date or may claim to have against the BMMC Released Parties arising out of or with respect to any and all transactions relating to the BMMC Note and BMMC Note Obligations, occurring on or before the Effective Date, including any loss, cost or damage of any kind or character arising out of or in any way connected with or in any way resulting from the acts, actions or omissions of the BMMC Released Parties occurring on or before the Effective Date. The foregoing release is intended to be, and is, a full, complete and general release in favor of the BMMC Released Parties with respect to all claims, demands, actions, causes of action and other matters described therein, including specifically, without limitation, any claims, demands or causes of action based upon allegations of breach of fiduciary duty, . . . or any other theory, cause of action, occurrence, matter or thing which might result in liability upon the BMMC Released Parties arising or occurring on or before the Effective Date. The Cathay Industries Releasing Parties understand and agree that the foregoing general release is in consideration for the agreements of BMMC contained herein and that they will receive no further consideration for such release.

(*Id.* ¶ 8, Ex. B.1 at 2.)

Also on December 31, 2012, Compass and Cathay agreed to cancel the 2011 Services Agreement.

According to Bellah's testimony, he and Terence Yu, the principal of Holdings, intended the Payoff Agreement to be all-encompassing and deal with all

5

of the parties' and related entities' obligations toward one another. (Def.'s LR 56.1(b)(3)(C) ¶ 23.) Plaintiff disputes this characterization, noting that as of June 8, 2015, Bellah was in communication with Yu to pay $500,000 in exchange for receiving a copy of the Compass Note stating it was paid in full. (Pl.'s LR 56.1(a) ¶ 23.)

Defendant's Third Affirmative Defense states that "[t]o the extend Defendant owed any money to Plaintiff, said obligation was satisfied and released as part of a series of transactions between Plaintiff and Defendant." (Pl.'s LR 56.1(a)(3) ¶ 9.) In response to an interrogatory, Defendant identified the transactions related to this affirmative defense as the 2012 Assignment of the Compass Note to Cathay, and the December 31, 2012 Payoff Agreement. (*Id.* ¶ 10.)

## DISCUSSION

### I. LEGAL STANDARD

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court must draw all reasonable inferences in favor of the nonmovant. *Bennington v. Caterpillar Inc.,* 275 F.3d 654, 658 (7th Cir. 2001).

However, once the movant has carried its burden under Rule 56(c), "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S.

6

574, 586 (1986). The party opposing summary judgment must offer admissible evidence in support of his version of events, and hearsay evidence does not create a genuine issue of material fact. *McKenzie v. Ill. Dep't of Transp.*, 92 F.3d 473, 484 (7th Cir. 1996); *see Larimer v. Dayton Hudson Corp.*, 137 F.3d 497, 500 (7th Cir. 1998) ("'If the non-moving party bears the burden of proof on an issue, . . . that party may not rest on the pleadings and must instead show that there is a genuine issue of material fact.'") (citation omitted). "The mere existence of an alleged factual dispute is not sufficient to defeat a summary judgment motion. . . . The nonmovant will successfully oppose summary judgment only when it presents 'definite, competent evidence to rebut the motion.'" *Vukadinovich v. Bd. of Sch. Trs. of N. Newton Sch. Corp.*, 278 F.3d 693, 699 (7th Cir. 2002) (citations omitted); *see also Hall v. Bodine Elec. Co.,* 276 F.3d 345, 354 (7th Cir. 2002) ("Conclusory allegations and self-serving affidavits, without support in the record, do not create a triable issue of fact.").

"In considering a motion for summary judgment, this court is not required to scour the record in search of evidence to defeat the motion; the nonmoving party must identify with reasonable particularity the evidence upon which the party relies." *Pleniceanu v. Brown Printing Co.*, No. 05 C 5675, 2007 WL 781726, at *7 (N.D. Ill. Mar. 12, 2007) (citing *Johnson v. Cambridge Indus., Inc.,* 325 F.3d 892, 898 (7th Cir. 2003)); *see Estate of Moreland v. Dieter*, 395 F.3d 747, 759 (7th Cir. 2005). Finally, the Court is "'not required to draw every conceivable inference from the record.'" *McCoy v. Harrison,* 341 F.3d 600, 604 (7th Cir. 2003) (citation omitted).

## II. ANALYSIS

The parties agree that at the time the Payoff Agreement was executed, Bellah personally owed certain amounts to Cathay under the Compass Note. The question at issue is whether the releases in the Payoff Agreement extinguished the Compass Note obligation.

Under Illinois law, which the parties agree governs in this case, construction of an unambiguous contract is determined as a matter of law. *See Farm Credit Bank of St. Louis v. Whitlock*, 581 N.E.2d 664, 667 (Ill. 1991). But if a contract is ambiguous, "its construction is then a question of fact, and parol evidence is admissible to explain and ascertain what the parties intended." *Whitlock*, 581 N.E.2d at 667 ("A contract will be considered ambiguous if it is capable of being understood in more sense than one."); *see Bank of Commerce v. Hoffman*, 829 F.3d 542, 546-47 (7th Cir. 2016) ("[W]hen determining whether an agreement is ambiguous, the court must construe that contract as a whole.").

The release in this case contains multiple release statements and language suggesting both a general and a specific release. As Plaintiff acknowledges, courts treat such mixed release statements as creating an ambiguity. *See Bank of Commerce v. Hoffman*, 829 F.3d 542, 547 (7th Cir. 2016); *Whitlock*, 581 N.E.2d at 665-67; *Countryman*, 686 N.E.2d at 64.

Once a contract is deemed ambiguous, courts are directed to determine the meaning of the contract through extrinsic evidence and rules of construction. *See Hoffman*, 829 F.3d at 547. Plaintiff cites *Hoffman* for the notion that even when

relying on extrinsic evidence, a court may conclude that the contract is susceptible to only one interpretation. *Hoffman*, 829 F.3d at 548; *see also Baker v. America's Mortg. Servicing, Inc.*, 58 F.3d 321, 326 (7th Cir. 1995) ("Under Illinois law, if a contract is ambiguous, its interpretation is a question of law for the court as long as the extrinsic evidence bearing on the interpretation is undisputed.") But in *Hoffman*, the defendant's own testimony established that he knew the obligation at issue was not released in a settlement contract, so there was no need to explore any other evidence outside the contract. *Hoffman*, 829 F.3d at 547. In this case, however, Bellah maintains that the Payoff Agreement extinguished his Compass Note obligations,[4] and there is no evidence in the record as to Yu's understanding of the release's scope.

The rules of construction also do not favor summary judgment. Under Illinois law, a contract that may allow different interpretations must be read in a manner that is "fair, customary, and such as prudent men would naturally execute." *Hoffman*, 829 F.3d at 548 (internal quotation and citation omitted). In cases where

---

[4] Plaintiff's response to Defendant's Statement of Additional Material Facts number 23 discussed a series of emails between Bellah and Yu in 2015 that Plaintiff's response suggested proved Bellah's knowledge that the Compass Note was not extinguished. (Pl.'s LR 56.1(a) ¶ 23.) The emails mention Bellah's intention to pay Yu $2.6 million from BMMC and $500,000 from his personal account in order to "clear all debt between us, personally and professionally," and it references the Compass Note. (*Id.*, Ex. D at 19-24.) However, Plaintiff expressly acknowledges that it is not relying on any extrinsic evidence, and this fact statement was not discussed in the motion. *See Malec v. Sanford*, 191 F.R.D. 581, 586 (N.D. Ill. 2000) ("A legal standard, even if correct, is useless to us unless applied to the facts of the case, particularly if it is a broad legal standard."). Defendant has moved to strike Plaintiff's response to paragraph 23 pursuant to Federal Rule of Evidence 408; because the Court has not considered this evidence, Defendant's Motion to Strike [Doc. No. 61] is denied as moot. The Court also notes that even if the emails were considered, they would not constitute an unequivocal admission of Bellah's understanding of the scope of the 2012 release.

two provisions are in conflict, "the more specific provision relating to the same subject matter controls over the more general provision." *Hoffman*, 829 F.3d at 548 (internal quotation and citation omitted). Plaintiff appears to acknowledge that application of the Payoff Agreement's general release would extinguish Bellah's liability for the Compass Note, arguing that the Payoff Agreement's specific release of claims related to the BMMC Note and BMMC Note Obligations controls over any general release language. However, the specific release language is not as limited as that in *Hoffman*, on which Plaintiff relies.

The portion of the release Plaintiff deems "specific" does state that it relates to transactions arising out of or with respect to the BMMC Note and BMMC Note Obligations, but it goes on to more generally "include[e] any loss, cost or damage of any kind or character arising out of or in any way connected with or in any way resulting from the acts, actions or omissions of the BMMC Released Parties occurring on or before the Effective Date." (Pl.'s LR 56.1(a)(3) ¶ 8, Ex. B.1 at 2.) This clause could reasonably be read by a trier of fact as releasing Bellah's indebtedness for the Compass Note. *See Myers v. Health Specialists, S.C.*, 587 N.D.2d 494, 499 (Ill. App. Ct. 1992) (noting that the "sweeping language" of a specific release can serve to transform it into a general release); *see also Gallagher v. Lenart*, 874 N.E.2d 43, 60 (Ill. 2007) ("'[G]eneral release' is a conclusory term, and determining whether particular language constitutes a general release is entirely a matter of construing that language."). Illinois cases hold that general releases are limited to "the specific claims contained in the release agreement" if the releasing party was

10

unaware of other claims at the time of the release, but if both parties are aware of another claim, "courts have given effect to the general release language of the agreement to release that claim as well." *Whitlock*, 581 N.E.2d at 667. Because extrinsic evidence will be necessary for a trier of fact to determine the nature of the release as well as the parties' intentions as to its scope, summary judgment is inappropriate. *See Whitlock*, 581 N.E.2d at 667 ("Caution must be exercised in granting summary judgment so as not to preempt the right of a party to present the factual basis of his case to the fact finder.").

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Partial Summary Judgment [Doc. No. 33] is denied, and Defendant's Motion to Strike [Doc. No. 61] is denied as moot.

**SO ORDERED.**   **ENTERED:**

**DATE:   September 28, 2017**

**HON. MARIA VALDEZ**
**United States Magistrate Judge**