IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DIVISION OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CATHAY INDUSTRIES USA, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 16 CV 2070 |
| | ) | |
| v. | ) | Judge Robert W. Gettleman |
| | ) | |
| WILLIAM J. BELLAH, | ) | Magistrate Judge Maria Valdez |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION, *IN LIMINE*, TO BAR EVIDENCE RELATING TO SETTLEMENT COMMUNICATIONS**

Plaintiff, Cathay Industries USA, Inc. ("Cathay"), by and through its attorneys, Elvis Gonzalez, Ltd., for its Response to the Motion, *in Limine*, of Defendant, William J. Bellah ("Bellah"), states as follows:

*I.  INTRODUCTION*

This is an action to enforce the terms of a promissory note that Bellah executed in favor of Compass Chemical International, LLC ("Compass") in 2008 ("the Note"), which was later assigned to Cathay.  The primary factual issue for trial is whether the parties intended to release his obligations under the Note when they executed a Payoff Agreement between Cathay and BMMC Holdings, LLC ("BMMC")[1] dated December 13, 2012 ("the Payoff Agreement"). Specifically, Bellah has argued that the Payoff Agreement intended to effectuate a general release of all existing liabilities between the parties.  For its part, Cathay maintains the Payoff Agreement included a limited release that only applied to a $15,000,000 note owed by BMMC when it purchased Compass from Cathay.  Bellah now seeks to exclude evidence or testimony relating to certain settlement negotiations during 2015, primarily consisting of e-mails

---
[1] Bellah was the controlling, majority member of BMMC Holdings, LLC ("BMMC").

transmitted between himself and Terence Yu, the CEO of Cathay's parent company Cathay Pigments Holdings Limited, on the basis that they are inadmissible under Federal Rule of Evidence 408.

There are various categories of e-mails from different periods of time, which Cathay would seek to offer into evidence for various permissible purposes. First, Cathay would introduce Bellah's statements in e-mails dated November 3 and 4, 2014, which did not include an offer of compromise, to demonstrate that: (1) Bellah did not communicate a belief that the Note had been released as part of the Payoff Agreement in 2012, and (2) Cathay was making efforts to collect the Note, which bears on its intent in entering into the Payoff Agreement. Secondly, Cathay would seek to introduce e-mails in May of 2015 not to establish liability or damages due under the Note, but rather to show Bellah's belief that the debt sought in this lawsuit was not discharged when he executed the Payoff Agreement. More to the point, however, while e-mails sent in May of 2015 were an attempt to resolve certain issues between the parties, by Bellah's own testimony, they do not relate to efforts to compromise the claim at issue *here*. Rather, they were limited to negotiating a claim under a separate note that is not the subject of this suit. In addition, e-mails in May and June of 2015 would not be offered to establish damages or liability, but rather to explain why the Note was marked "Paid June - 9 2015." Finally, Cathay would seek to offer certain e-mails after June of 2015 to demonstrate that Bellah never communicated his belief that the Note had been released under the Payoff Agreement to Yu until November 15, 2015.

## II.     RELEVANT FACTS

### A.     E-mails Between Bellah and Yu in November of 2014.

On November 3, 2014, Yu transmitted an e-mail in which he wrote the following:

2

> Bill the outstanding amount of the loan note is USD3.125mill.[2]
> Even based on Fed rate of 0.2% per month the value of the note is USD3.35mill per end 2017 after the note is paid off. If I give you a discount rate of 5% per annum the value will be USD2.85mill for payment end of Dec 2014.
> Pls know that I also need a settle on USD951k you owed and the USD102k cash on the Condo[.]

A true and accurate copy of the e-mail is attached as Exhibit A. Bellah responded on November 4, 2014 by saying:

> I am in Colorado currently and back to Houston tomorrow and will call you then. Whatever the numbers come out to then I want to get it all cleared up. There is still a serious discrepancy in money die [sic] me so will discuss tomorrow.

(See Exhibit A). Bellah does not seemingly ask to bar introduction of these e-mails into evidence, but Cathay includes it in its Response to obtain a clear record of admissible e-mail evidence in advance of trial.

### B. Bellah's E-mails in May and June of 2015.

Three years after Bellah claims all his obligations to Cathay were released, he nevertheless sent the following e-mail to Yu on May 22, 2015:

> Terence: if you could agree to $3,000,000 then I will make payment in full early next week to clear all debt between us, personally and professionally. I feel this is fair for losses of income to me with business arranged in UK/Europe as well as other loss of income for products purchased over the years that ACL/CP was afforded[.]

A true and accurate copy of this e-mail is attached as Group Exhibit B. After a counter-offer from Yu, Bellah transmitted the following e-mail on May 22, 2015:

> I agree to the $3.1. I will expedite documentation to clear all accounts between us for yours and Miles signatures.

(See Group Exhibit B, p. 2). After a payment direction from Yu, Bellah sent the following e-mail on May 22, 2015:

---

[2] This amount represented a separate debt owed to Cathay Phosphorous Chemical Limited by BMMC in the amount of $3.125 million ("the Cathay Phosphorous Note"). The Cathay Phosphorous Note was repaid, and is not at issue in this lawsuit.

3

> Sign off comes before money and gets notarized! I will send $2.6 million from BMMC and $500,000 from my personal account when documents are signed and agreed to.
> That work?

(See Group Ex. B, p. 1). Approximately two weeks later, Bellah transmitted the following e-mail to Yu on June 8, 2015:

> Remainder of $500,000 from me personally will be sent when all documentation is in order and complete. Please have Miles send over documentation showing the loan between myself and Cathay USA is being paid in full and no amounts are owed by William J. Bellah to any part of Cathay various entities or to any officers, employees and related parties of Cathay.
> The [sic] I will wire the final $500,000 as long as all paperwork and documentation including paid notes are submitted.

A true and accurate copy of this email is attached as Exhibit C. On June 9, 2015, Cathay's CEO, Kevin Miles, sent the following e-mail to Bellah:

> Hi Bill,
> Attached is a copy of the original note for $1.5MM stamped as Paid. Please review and confirm the notation is sufficient and I will overnight it to your Texas address.

A true and accurate copy of this e-mail is attached as Group Exhibit D, at p. 1.

### C. Bellah's E-mails to Yu After June of 2015.

From June 24, 2015 to November 15, 2015, Yu and Bellah corresponded about receiving the final $500,000 that Bellah had previously agreed to pay. True and accurate copies of this correspondence are attached as Group Exhibit D, at pages 3-14. After Yu rejected Bellah's request to make the payment in installments of $50,000, Bellah sent the following e-mail to Yu on November 15, 2015:

> So I made you an offer and either take it or leave it. My lawyers say that the note was paid off when I bought you and axxhole out of Compass so this would be a gift.

(See Group Exhibit D, p 14).

4

### D. <u>Bellah's Testimony About the E-mails.</u>

Bellah was asked the following questions, and provided the following answers at his deposition:

> Q: [W]hat was owed at the time that you sent this e-mail to Mr. Yu that you believe you were compromising and conclusively resolved?
>
> A: Yeah, I think it was 3.125 I am thinking, and I was trying to get the whole thing done for three, and I think that I finally got it done for 2.6 or 2.625, something like that.
>
> Q: The obligation that you're referring to, is that the debt that was evidenced by the 3.125 million dollars promissory note owed to BMMC Holdings, Cathay Phosphorous Chemical Limited?
>
> A: Yes.
>
> Q: You believe that in agreeing to pay 3.1, you were making a payment that represented a compromise of the 3.125 that was owed?
>
> A: Yes.
>
> \* \* \* \*
>
> Q: So why were you paying the $500,000 from your personal account?
>
> A: Because that was a gift, again, that I was giving [Yu] for selling the company. As I told the story before, I bet a $1000 on the New York Giants to win the championship and they won and Terence said that I owed him half my winnings. I won $26,000 and I was giving him a gift. Prior to that, everything was covered under that agreement that was all-inclusive. So I was giving him a gift.
>
> Q: When you use the word gift, do you mean that the $500,000 had nothing to do with Cathay's claim that [it] was still owed money?
>
> A: Exactly. And I think I referenced it as a gift many times in here.
>
> Q: I just want to make certain that I understand your use of that word. Did you believe that the $500,000 that was being paid by you personally was unrelated to your resolution of all debt existed at that time?
>
> A: Absolutely. It had nothing to do with that. That had all been cleared up before. This was more of a gift that I was giving him personally from the money that I got from selling the company and the amount of money that I

5

     sold the company for. Like I said, I gave money to all of my employees, several million dollar in excess of 15 million dollars. So to give him a gift of $500,000, I did not think was out of the ordinary.

Q: So is it your testimony then that you were resolving the debt that existed for $2.6 million?

A: No. Resolving the debt was one payment. The $500,000 was a gift that I was giving Terence.

         \*  \*  \*  \*

Q: Okay. So your testimony then as I understand is that you were agreeing to pay $2.6 million dollars to resolve debt that existed. And in addition to that, you were paying $500,000 as a gift?

A: As a gift, yes.

(See Deposition of William J. Bellah, Exhibit E hereto, 44:14-45:11, 48:18-49:24, 51:3-7).

### III. ARGUMENT

Federal Rule of Evidence 408 provides as follows:

**a) Prohibited Uses.** Evidence of the following is not admissible--on behalf of any party-- either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction:

 **(1)** furnishing, promising, or offering--or accepting, promising to accept, or offering to accept--a valuable consideration in compromising or attempting to compromise the claim; and

 **(2)** conduct or a statement made during compromise negotiations about the claim-- except when offered in a criminal case and when the negotiations related to a claim by a public office in the exercise of its regulatory, investigative, or enforcement authority.

**(b) Exceptions.** The court may admit this evidence for another purpose, such as proving a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution

Fed. R. Evid. 408. Rule 408 forbids statements made in settlement negotiations to establish a party's liability or damages in the dispute that was the subject of the negotiation. Cates v. Morgan Portable Building Corp., 780 F. 2d 683, 691 (7th Cir. 1985). However, the rule does not require exclusion when the evidence is offered for another purpose. Bankcard Am., Inc. v.

6

Universal Bancard Sys., Inc., 203 F.3d 477, 483 (7th Cir. 2000). As such, Rule 408 is not an absolute ban on all evidence regarding settlement negotiations. Id. at 484. Among the purposes for which evidence of offers or agreements to compromise have been permitted include for purposes of rebuttal and to show the defendant's knowledge and intent. Bancard America, Inc., 203 F.3d at 484.

### A. The November 2014 E-Mail was not in Connection with an Offer of Compromise and Would Separately be Offered for a Permissible Reason.

As a threshold matter, evidence must be part of an offer of settlement or compromise, and not merely the assertion of a debt, to be excluded by Rule 408. See generally Winchester Packaging, Inc. v. Mobil Chemical Co., 14 F.3d 316, 319 (7th Cir. 1994). Yet, neither Yu's e-mail to Bellah, nor Bellah's response in November of 2014 were sent in the course of settlement negotiations. Therefore, they are not within the scope of Rule 408. Moreover, the e-mails would not be offered to establish Cathay's damages or Bellah's liability, but rather to show that Cathay was taking action to collect the Note. This is probative of the question of its intent in entering into the Payoff Agreement, and tends to prove its belief that the debt still existed in 2014 and had not been released by the Payoff Agreement. In addition and as will be addressed with greater comprehensiveness in Section III(c) below, it is evidence of Bellah's intent in entering into the Payoff Agreement because he never stated his belief that the Note had been released. He merely stated that there were discrepancies in the amounts due *him*. As such, this e-mail should be permitted into evidence at the trial of this matter.

### B. By his own Words, Bellah's Offer to pay $3.1 Million was Made in an Attempt to Compromise the Cathay Phosphorous Note Debt, Which is not at Issue in this Lawsuit.

It bears reiterating that Rule 408 forbids statements made in settlement negotiations to establish a party's liability or damages *in the dispute that was the subject of the negotiation*.

7

Cates, *supra*, (emphasis added). The application of the foregoing principle to the case at bar is straightforward. Bellah has unambiguously testified that in communicating with Yu in May and June of 2015, he was negotiating a compromise of the $3.125 million dollar Cathay Phosphorous Note, and that any agreement to pay $500,000 from his personal account was a "gift" to Yu. Because the communications in May and June of 2015 only contained an offer to settle or compromise a claim related to the Cathay Phosphorous Note, Rule 408 has no application as Bellah's liability under the Cathay Phosphorous Note is not at issue in this case. Therefore, exclusion of these communications under Rule 408 is improper, and Bellah's Motion should be denied.

### C. The E-Mails Dated May 22, 2015 may be Offered to Show Bellah's Intent in Entering Into the Payoff Agreement and the Scope of its Release.

Even assuming, *arguendo*, that Bellah's e-mails constituted an offer to settle or compromise the claim at issue here, they would not be offered to establish the validity or amount of Bellah's liability, but rather to show his subjective belief at the time that his debt under the Note still existed. This tends to prove his intent in entering into the Payoff Agreement - this dispute's central factual question. As noted above, courts have repeatedly permitted evidence of offers to compromise to show intent. In United States v. Hauert,[3] 40 F. 3d 197, 199 (7th Cir. 1994), evidence of a prior tax settlement was used in a criminal tax evasion case. The Defendant asserted a "good faith misunderstanding of the law" defense, under which he was required to satisfy an "objectively reasonable standard." Id. Because his state of mind was a central issue in the case, the government sought to introduce evidence of settlement documents he signed years earlier in a civil suit in which he gave up any contention that his wages were not taxable. Id. Affirming the district court's admission of the evidence, the Seventh Circuit wrote:

---

[3] Bellah's Motion ignores Hauert, and makes no attempt to distinguish it in any way.

8

> The purpose of the evidence in question was to show Hauert's knowledge and intent regarding his obligation to report and pay taxes on his Caterpillar (and other) earnings. . . The evidence involving the earlier years may not have been admissible to show Hauert's civil tax liability in those earlier years or to his claims or the government's claims in the context of civil tax liability. This evidence was admissible under Rule 408 for "another purpose" in this case.

Id. at 200.

Similarly, the U.S. Court of Appeals for the Fourth Circuit has specifically recognized that statements in the course of settlement communications are admissible to prove a party's intent as to the scope of a release. Coakley & Williams Construction Inc. v. Structural Concrete Equipment, Inc., 973 F.2d 349, 350 (4th Cir. 1992) began in 1988, and involved claims of conversion and trespass by a general contractor against a subcontractor involved in a project to construct a Days Inn motel. During the course of settlement discussions in 1989, the general contractor wrote a settlement offer to the subcontractor, stating: "Without prejudice and to settle all disputes between the parties, Coakley & Williams Construction Co., Inc. will pay the sum of $47,500.00. The parties would enter into a mutual release reserving only any claims which either Structural or Coakley may have against Superior." Id. at 350. Shortly thereafter, the parties entered into a settlement agreement, which disposed of the litigation. Id. at 351.

Two years later, the general contractor again sued the subcontractor, but this time for fraudulent and negligent inducement, claiming that it had entered into the parties' contract based upon misrepresentations. Id. at 351. As in the case at bar, the parties disagreed over the scope of the release, and its language was central to the district court's consideration of the subcontractor's motion for summary judgment. Id. It determined that "even though the release is worded in terms of matters and causes 'arising out of the Complaint, First Amended Complaint and Counterclaim filed in the above-captioned litigation,' it is this Court's opinion that the intent of the parties in entering into it . . . , twice expressed therein as an intent to 'avoid

9

further litigation,' was to settle all claims the parties had against each other arising out of the Days Inn job, whether they had yet been pleaded or not." Id. The district court went on to find, "The parties' intent was made manifest in the [settlement offer]." Id.

Among the arguments made by the general contractor to the appellate court was that the settlement offer was inadmissible under Rule 408. Id. at 353. Quickly disposing of this contention, the court wrote:

> [S]ettlement offers are only inadmissible when offered to prove liability or damages. *See* Fed.R.Evid. 408. The district court only considered the offer as evidence of the parties' intent. Therefore, even if the release in the settlement agreement was ambiguous, extrinsic evidence of the parties' intent resolves the ambiguity in favor of [Subcontractor]'s position that the release bars this action.

Id. at 353-54. As in both Hauert and Coakley, Cathay would only offer Bellah's statements to show his intent in entering into the Payoff Agreement and the intended scope of its release. This is permissible under Rule 408, and Bellah's Motion should be denied.

> **D.** **The E-Mails Between Bellah and Yu in May and June of 2015 Would be Separately Used to Explain why the Note was Marked "Paid June – 9 2015."**

In addition to demonstrating Bellah's intent, the e-mails in May and June of 2015 would be offered to explain why the Note was eventually marked "Paid June – 9 2015." This would be necessary to rebut any contention by Bellah that the notation was attributable to an intended release of the Note under the Payoff Agreement. Under Bancard America, Inc., *supra*, rebuttal is a permissible purpose for these communications even if made in the course of settlement negotiations. Therefore, the e-mails should be permitted into evidence on this basis, as well.

> **E.** **The E-Mails After June of 2015 Were not in Connection with Offers of Settlement and Would be Offered to Show Bellah's Belief as to the Scope of the Payoff Agreement's Release.**

As with the e-mails between Bellah and Yu in November of 2014, their correspondence from June 30, 2015 to November 15, 2015 were not statements made during compromise

10

negotiations, and are not within Rule 408's exclusion. Rather, they all concern Cathay's attempts to collect Bellah's $500,000 "gift." In addition, they would be offered to show Bellah's intent in entering into the Payoff Agreement because he never stated a belief that the Note had been released.[4] Perhaps the most probative evidence of Bellah's subjective state of mind in December of 2012 when he executed the Payoff Agreement are the actions he took three years later. Indeed, the first mention Bellah ever made of the Note having been released by the Payoff Agreement occurred on November 15, 2015 when he wrote that his "*lawyers* say that the note was paid off when I bought you and axxhole out of Compass." (See Group Ex. D, p. 14) (emphasis added). This would tend to prove that he did not intend for the Note to be released under the Payoff Agreement at the time he signed it because he did not hold a subjective, personal understanding of such a release until after his attorneys conjured the legal theory three years later. Therefore, Cathay would offer these e-mails for permissible uses, and Bellah's Motion should be denied.

---

[4] Bellah relies heavily on Alexander, et al. v. City of Evansville, 120 F. 3d 723 (7th Cir. 1997) for the proposition that evidence, which indirectly establishes liability by showing knowledge or intent, comes within Rule 408. As an initial matter, any adverse statement by a defendant permitted for another use under Rule 408 could ultimately help a plaintiff prove its case and establish liability. Indeed, in Hauert, *supra*, the Seventh Circuit affirmed the admission of a prior tax settlement to show knowledge and intent even though it helped the IRS establish Hauer's liability. Therefore, this cannot be a basis for excluding evidence here. Moreover, Alexander 120 F. 3d at 728-26 emphasized the significance of evidence that a party did *not* take action in ascertaining their intent.

## IV. CONCLUSION

For all the foregoing reasons, the Motion *in Limine* of Defendant, William J. Bellah, should be denied.

          Respectfully Submitted,

          CATHAY INDUSTRIES USA, INC.

          /s Elvis D. Gonzalez_____
          By:  Its Attorney

Elvis D. Gonzalez (ARDC No. 6280115)
egonzalez@elvisgonzalezltd.com
Katherine A. Rehan (ARDC No. 6302822)
krehan@elvisgonzalezltd.com
ELVIS GONZALEZ, LTD.
233 South Wacker Drive, Suite 2280
Chicago, IL 60606
(312) 558-9779
405633.3-12020.00100

*Attorneys for Plaintiff*