IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CATHAY INDUSTRIES USA, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 16 C 2070 |
| v. | ) | |
| | ) | Magistrate Judge |
| WILLIAM J. BELLAH, | ) | Maria Valdez |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Cathay Industries, USA, Inc. brought this complaint against Defendant William J. Bellah alleging breach of contract with respect to repayment of a promissory note. Bellah disputes that any amounts are owed.

A one-day bench trial was heard on April 15, 2019. The matter is now before the Court for findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure ("Rule") 52(a). The Court has considered the testimony of the witnesses who testified at trial, the parties' admitted trial exhibits, the stipulations made by the parties, the proposed findings of fact and conclusions of law submitted by the parties, and the closing arguments of counsel. To the extent certain findings of fact may be deemed conclusions of law, they should also be considered conclusions of law. Similarly, to the extent matters contained in the conclusions of law may be deemed findings of fact, they should also be considered findings of fact.

## FINDINGS OF FACT

1. Plaintiff Cathay Industries USA, Inc. ("Cathay USA") is a manufacturer and distributor of iron oxide pigments. (Tr. 16:15-17.) Cathay USA is a Nevada company with its principal place of business in Valparaiso, Indiana, and it is authorized to transact business in Illinois. (Compl. ¶ 1.)

2. Defendant William J. Bellah is an individual who resides in Mexico and Colorado. (Tr. 71:22-24.)

3. This Court has diversity jurisdiction under 28 U.S.C. § 1332(a)(1), because Cathay USA and Bellah are citizens of different states, and the amount in controversy exceeds $75,000. (Joint Final Pretrial Order ["JPTO"], Sec. 1.)

4. Terence Yu is the CEO of Cathay Pigments Holdings, Inc. ("Cathay Holdings"). Plaintiff Cathay USA is a wholly owned subsidiary of Cathay Holdings. (Yu Dep. at 6:17-25; Def.'s Ex. 7, at 8.)

5. Kevin Miles, who is currently Cathay USA's Chief Executive Officer, was Compass's Chief Financial Officer from 2007 to 2012. (Tr. 18:1-3.)

6. Prior to January 1, 2007, Bellah met Terence Yu. (Tr. 74:9-17.)

7. Prior to January 1, 2007, Bellah was an owner of Compass Chemical International, LLC ("Compass"), which imported phosphorus derivatives for use in various industrial and water treatment applications. Bellah started the company out of his house. (Tr. 73:3-74:8.)

8. Yu assisted Bellah in setting up Compass, and both men originally had an ownership interest in the company, either personally or through corporate control. (Tr. 74:15-24; Yu Dep. 8:12-19.)

9. Cathay USA acquired Compass from Bellah, among others, on January 1, 2007. (JPTO Stip. 1.)

10. Also on January 1, 2007, Bel-Air Investments ("Bel-Air"), a company owned and controlled by Bellah, and Cathay Holdings entered into a Consulting Services Agreement ("2007 Consulting Agreement"). (JPTO Stip. 3.)

11. As a result of the sale of Compass, Bellah incurred certain tax obligations amounting to nearly $1.5 million. (JPTO Stip. 2.)

12. The tax obligations were the result of Yu's preferred method of effecting the merger. (Tr. 51:24-52:16.) It was originally structured to be a non-taxable event, but the merger was finally structured in a way that allowed Cathay Holdings to get a valuation advantage for negative goodwill. (Def.'s Ex. 2; Tr. 52:4-12.) Yu "explicitly" said that the merger would have to structured so that Bellah would realize a gain and ultimately be responsible for the resulting tax consequences over the next ten years. (Yu Dep. 30:13-31:16.)

13. According to Yu, it was important to him for the transaction to be a share swap, and he needed it to be completed by the end of the year. (Yu Dep. at 23:17-23.)

14. Bellah, however, refused to engage in the share swap unless Yu gave him the $1.5 million. (Yu Dep. at 24:3-5.) Yu came up with the idea to lend Bellah

3

$1.5 million because at that point Yu could "not go back to [his] board to say that the deal is off." (Yu Dep. at 24:7-11.)

15. On September 23, 2008, Bellah prepared and executed a $1,500,000.00 Promissory Note (the "Note") in favor of Compass. (JPTO Stip. 2; Tr. 42:13-16; Yu Dep. at 27:23-28:5; 80:23-81:4.)

16. The Note states that the loan was "made by [Compass] to [Bellah] under and pursuant to that certain Agreement by and between [Bellah], [Compass], and Terence Yu, dated simultaneously herewith." (JPTO Stip. 2; Joint Ex. 1 at 1.) The Note further states that it "evidences certain promises made by [Bellah] under and pursuant to the Agreement, to which reference is hereby made for a statement of the terms and conditions under which the Maturity Date or any payment hereon may be accelerated. The holder of this Promissory Note is entitled to all of the benefits and security provided for in the Agreement." (Joint Ex. at 3.)

17. Yu does not recall a written contract reflecting the "Agreement" referenced in the Note but believes the term referred to the share swap, by which Cathay USA acquired Compass. (Yu Dep. at 21:25-23:16.)

18. According to Yu, the Agreement provided that Bellah would work for Cathay USA for ten years, and the Note would be repaid from his bonus payment during that time. (Yu Dep. at 21:5-20, 27:18-22, 28:8-16.)

19. The Note provides that the outstanding principal and 5% annual interest on the loan would be payable in yearly installments beginning September 15, 2009 and ending on September 15, 2018. (Joint Ex. 1 at 1-2.)

20. Pursuant to the 2007 Consulting Agreement, Bel-Air was to provide "General Worldwide management and sales consulting services" to Cathay Holdings in exchange for monthly fees, starting at $20,000 per month in 2007 and increasing yearly to $30,000 per month in 2011. (Joint Ex. 3, Sched. A-B.)

21. The 2007 Consulting Agreement also obligated Cathay Holdings to make bonus payments to Bel-Air, immediately following each calendar year to be paid prior to the end of the first quarter of the following year, equal to a lump sum payment equal to the prior year's total payments or a minimum as follows: Q1 2008 = $240,000, Q1 2009 = $270,000, Q1 2010 = $300,000, Q1 2011 = $330,000, and Q1 2012 = $360,000. (JPTO Stip. 4.)

22. The parties to the 2007 Consulting Agreement (Cathay Holdings and Bel-Air) and the parties to the Note (Compass and Bellah) agreed that a portion of the amounts due to Bel-Air under the 2007 Consulting Agreement would be credited toward the Note to reduce the amounts Bellah owed. (JPTO Stip. 5; Tr. 52:17-23.)

23. Bellah would direct Miles to apply a portion of the bonus payments due each year under the 2007 Consulting Agreement to the Note, with the balance to be distributed in cash. (Tr. 19:15-18, 19:24-20:6.) No one other than Bellah directed the manner in which bonuses under the 2007 Consulting Agreement were to be applied. (Tr. 20:7-10.)

24. Although Cathay Holdings was the party to the 2007 Consulting Agreement, Cathay USA paid the bonuses due to Bel-Air under that contract. Cathay USA would charge back the amount of payments made on behalf of Cathay

Holdings through an inter-company account to offset other items, because it was easier to effectuate payments in U.S. dollars out of domestic accounts than it was to transmit wires from Hong Kong or China. (Tr. 66:4-13.)

25. On April 1, 2010, Cathay USA applied half of the bonus due Bel-Air under the 2007 Consulting Agreement to reduce Bellah's balance under the Note in the amount of $150,000. (JPTO Stip. 6.)

26. On March 1, 2011, Cathay USA applied 100 percent of the bonus due Bel-Air under the 2007 Consulting Agreement to reduce Bellah's balance under the Note in the amount of $330,000. (JPTO Stip. 7.)

27. On April 1, 2012, the interest rate on the Note was reduced from 5% per annum to 1%. (Tr. 19:6-11.)

28. On October 15, 2012, Cathay USA applied half of the bonus due Bel-Air under the 2007 Consulting Agreement to reduce Bellah's balance under the Note in the amount of $165,000. According to Miles, the remaining $165,000 was paid to Bellah or one of his designated entities in cash via wire transfer (Tr. 21:5-13, 48:5-7; Pl.'s Ex. 35.)

29. Bellah did not make any further payments on the Note after October 15, 2012. (Tr. 23:7-9.)

30. In 2011, Bellah and Yu mutually decided to undo Cathay USA's 2007 acquisition of Compass. (Tr. 81:1-82:24.) On October 1, 2011, Cathay USA divested its interest in Compass, transferring it to BMMC Holdings, LLC ("BMMC"). (JPTO Stip. 8.)

31. BMMC's members were Bel-Air Investments, Inc., Daniel McCaul, Kevin Miles, and Cathay Phosphorous Chemical Limited. (JPTO Stip. 10.)

32. The 2007 Consulting Agreement between Bel-Air and Cathay Holdings was cancelled, or finished, after Compass was transferred back to Bellah. (Yu Dep. at 39:16-40:13.)

33. As payment for Cathay USA's interest in Compass, BMMC executed a promissory note dated as of October 1, 2011 in the amount of $15,000,000 in favor of Cathay USA (the "BMMC Note"). (JPTO Stip. 9.)

34. Also on October 1, 2011, Compass and Cathay USA entered into a Service Agreement ("2011 Service Agreement") whereby Cathay USA would be providing administrative services to Compass. (JPTO Stip. 11.)

35. On March 19, 2012, Compass assigned the Note to Cathay USA to offset amounts owed by Compass to Cathay USA under the 2011 Service Agreement. (JPTO Stip. 12; Def.'s Ex. 3.)

36. On December 31, 2012, BMMC and Cathay USA entered into a Payoff Agreement whereby BMMC exchanged a $15 million note that BMMC held from Cathay Holdings in order to satisfy BMMC's obligations to Cathay USA under the BMMC Note. (JPTO Stip. 13; Joint Ex. 2.)

37. Also on December 31, 2012, Compass and Cathay USA agreed to cancel the 2011 Service Agreement. (JPTO Stip. 14.)

38. Several individuals, including Miles and Bellah, participated in structuring the transaction involving the Payoff Agreement, and Yu was kept apprised of the overall structure of the deal. (Tr. 30:13-31:23.)

39. The parties settled on the final structure of the Payoff Agreement because it gave the greatest tax benefits, it legally met the needed criteria, and it was mutually beneficial to all parties. (Tr. 32:17-21.)

40. Bellah and Yu did not discuss including the Note as part of the Payoff Agreement, and Bellah did not expressly mention including the Note in the Payoff Agreement during the time the structure of the transaction was being discussed. (Yu. Dep. at 84:15-20; Tr. 33:18-34:9; Tr. 84:15-18.)

41. Bellah, however, believed based on information from his attorneys that "everything was cleaned up at that time," meaning that he no longer had any obligations under the Note. (Tr. 84:19-23.)

42. Bellah sold Compass on March 4, 2015. (Tr. 86:9-10.)

43. On January 19, 2016, Cathay USA served notice of acceleration upon Bellah, declaring all unpaid interest and outstanding principal immediately due and payable. (JPTO Stip. 15.)

44. There were no efforts made to collect amounts due under the Note in 2013 or 2014.

45. Cathay USA claims that the amount of the balance due under the Note as of April 15, 2019 was $1,180,224.00. (Tr. at 23:15.)

46. Paragraph 2 of the Payoff Agreement provided that:

Release of BMMC Note Obligations: In exchange for BMMC's transfer and assignment of the Cathay Holdings Note as set for in Section 3, below, BMMC shall be deemed to be fully, irrevocably, unconditionally and forever released and discharged from its obligations and liabilities with respect to the BMMC Note and BMMC Note Obligations, without any further action by any person, and the principal and interest, with respect to the BMMC Note will be deemed paid in full and fully discharged. (Joint Ex. 2 at 1-2.)

47. Paragraph 4 of the Payoff Agreement provided:

Release of Claims: [The Cathay Industries Releasing parties] . . . hereby fully, finally and completely RELEASE AND FOREVER DISCHARGE BMMC, and its successor, assigns, . . . officers, shareholders, . . . [collectively the "BMMC Released Parties"] of and from any and all claims, . . . liabilities, obligations, demands, damages, debts, liens, actions and causes of action of any and every nature whatsoever, known or unknown, whether at law, by statute or in equity, in contract or in tort, under state or federal jurisdiction, and whether or not the economic effects of such alleged matters arise or are discovered in the future, which the Cathay Industries Releasing Parties have as of the Effective Date or may claim to have against the BMMC Released Parties arising out of or with respect to any and all transactions relating to the BMMC Note and BMMC Note Obligations, occurring on or before the Effective Date, including any loss, cost or damage of any kind or character arising out of or in any way connected with or in any way resulting from the acts, actions or omissions of the BMMC Released Parties occurring on or before the Effective Date. The foregoing release is intended to be, and is, a full, complete and general release in favor of the BMMC Released Parties with respect to all claims, demands, actions, causes of action and other matters described therein, including specifically, without limitation, any claims, demands or causes of action based upon allegations of breach of fiduciary duty, . . . or any other theory, cause of action, occurrence, matter or thing which might result in liability upon the BMMC Released Parties arising or occurring on or before the Effective Date. The Cathay Industries Releasing Parties understand and agree that the foregoing general release is in consideration for the agreements of BMMC contained herein and that they will receive no further consideration for such release. (Joint Ex. 2 at 2.)

48. Ernie Peterek is a certified public accountant and is currently employed at the accounting firm of Johnson, Peterek & Howse, LLC, located in Lombard, Illinois. (Peterek Stip., Doc. No. 122, ¶ 1.)

49. Peterek has provided tax and accounting services to Bellah individually as well as to entities in which he has an ownership interest, including Bel-Air Investments ("Bel-Air"). (Peterek Stip., ¶ 2.)

50. Approximately two years ago, Bellah or his counsel asked Peterek to prepare, for purposes of the present litigation, a summary or report of payments made to Bel-Air under the 2007 Consulting Agreement. (Peterek Stip., ¶ 3.)

51. Peterek's summary reflected fees and bonuses paid to Bel-Air under the 2007 Consulting Agreement. (Peterek Stip., ¶ 4; Def.'s Ex. 1.)

52. Bellah received payments under the 2007 Consulting Agreement in 2012 even though its initial five-year term expired in 2011. (Peterek Stip., ¶¶5-6, 13; Def.'s Ex. 1.)

53. Bellah, Yu, and Miles agree that the 2007 Consulting Agreement was terminated after the Payoff Agreement was executed, although no formal written document reflected the termination. (Tr. 57:20-58:7; Tr. 85:4-14; Yu Dep. 66:20-67:13.)

54. According to Peterek, $645,000 worth of payments made under the 2007 Consulting Agreement were credited or applied against the Note from 2007 to 2012. (Peterek Stip., ¶ 9; Def.'s Ex. 1.)

55. An additional $2,173,000 in consulting fees and bonuses was received by Bellah from 2007 to 2012 pursuant to the 2007 Consulting Agreement. (Peterek Stip., ¶ 9; Def.'s Ex. 1.)

56. According to Peterek, the terms of the 2007 Consulting Agreement provided that Bellah was to receive a total of $3,780,000 in fees and bonuses during the years 2007 to 2012, leaving a $962,000 shortfall between the amounts he was paid and due to receive under the contract. (Peterek Stip., ¶¶ 9-10; Def.'s Ex. 1.) Bonuses due but not paid represented a total of $700,000 of the shortfall. (Peterek Stip., ¶ 10.)

57. In calculating the shortfall, Peterek did not include an October 15, 2015 wire transfer described by Miles in his testimony. (Peterek Stip., ¶ 12; Tr. 21:5-13, 47:24-48:7; Pl.'s Ex. 35.) Cathay USA's exhibit reflects a wire transfer out of its account in the amount of $165,000, but no documentation in the record indicates the recipient of the wire. (Pl.'s Ex. 35.)

58. Crediting Cathay USA for payment of the $165,000 wire transfer to Bellah would result in a total $535,000 shortfall of the amount due him under the 2007 Consulting Agreement for the years 2007 to 2012.

## **CONCLUSIONS OF LAW**

1. The Note and Payoff Agreement both provide that they are to be interpreted in accordance with Illinois law. (Joint Ex. 2, Joint Ex. 5.)

2. Under Illinois law, to state a claim for breach of contract, a plaintiff must allege "(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages." *W.W. Vincent and Co. v. First Colony Life Ins. Co.*, 814 N.E.2d 960, 967 (Ill. App. Ct. 2004).

3. "The primary objective in construing a contract is to give effect to the intent of the parties." *Gallagher v. Lenart,* 874 N.E.2d 43, 58 (2007). The language of the contract, "given its plain and ordinary meaning, is the best indication of the parties' intent." *Id.*

4. "Moreover, because words derive their meaning from the context in which they are used, a contract must be construed as a whole, viewing each part in light of the others. . . . The intent of the parties is not to be gathered from detached portions of a contract or from any clause or provision standing by itself." *Id.* (citation omitted).

5. "The intention of the parties to contract must be determined from the instrument itself, and construction of the instrument where no ambiguity exists is a matter of law." *Farm Credit Bank of St. Louis v. Whitlock*, 581 N.E.2d 664, 667 (Ill. 1991).

6. In Illinois contract law, there is a "long-standing principle that instruments executed at the same time, by the same parties, for the same purpose, and in the course of the same transaction are regarded as one contract and will be construed together." *Gallagher,* 874 N.E.2d at 58.

7. "For a contract to incorporate all or part of another document by reference, the reference must show an intention to incorporate the document and make it part of the contract. . . . If so incorporated, those additional provisions become as much a part of the contract as if they were expressly written in it." *Wilson v. Wilson,* 577 N.E.2d 1323, 1329 (Ill. App. Ct. 1991).

8. The Agreement referenced in the Note was the January 1, 2007 share swap resulting in Cathay USA's acquisition of Compass from Bellah.

9. The 2007 Consulting Agreement was executed on the same day as the Agreement's Compass share swap, and it provided that Bellah was to be paid (through Bel-Air) for his consulting work for Compass after the sale.

10. Because the Note specifies that the loan was made "under and pursuant to" the Agreement, and that Bellah was entitled to "all of the benefits and security provided for in the Agreement," the Note should be construed together with the Agreement and the 2007 Consulting Agreement.

11. "If the language of the contract is facially unambiguous, then the contract is interpreted by the trial court as a matter of law without the use of parol evidence." *Air Safety, Inc. v. Teachers Realty Corp.*, 706 N.E.2d 882, 884 (Ill. 1999).

12. "A contract will be considered ambiguous if it is is capable of being understood in more than one sense." *Farm Credit Bank*, 581 N.E.2d at 667.

13. "Where a court determines that a contract is ambiguous, its construction is then a question of fact, and parol evidence is admissible to explain and ascertain what the parties intended." *Id.*

14. The Note's references to and incorporation of unwritten terms in the Agreement constitute a facial ambiguity, and thus parol evidence may be used to discern the parties' intent with respect to the contract.

15. The Agreement was structured as a share swap at Yu's sole insistence, and for the sole benefit of Cathay Holdings, which obtained a valuation advantage for negative goodwill.

16. The structure demanded by Yu resulted in no particular benefit for Bellah, and to the contrary, encumbered him with significant tax liability.

17. Bellah would not have agreed to Yu's preferred merger structure if he had been responsible for any of the $1.5 million in taxes.

18. Yu needed the deal to be consummated in a timely manner, so he agreed to reimburse Bellah for his future tax liability through the Note.

19. Although the Note was called a loan, Yu's testimony about the Agreement and the parties' course of dealing demonstrate that its purpose was to fully reimburse Bellah.

20. The Note was to be repaid only from the 2007 Consulting Agreement bonuses, not by Bellah personally.

21. Once the 2007 Consulting Agreement was cancelled, Bellah's obligation to pay the Note was cancelled.

## CONCLUSION

For the foregoing reasons, the Court finds in favor of Defendant William J. Bellah and against Plaintiff Cathay Industries USA, Inc.

**SO ORDERED.**                           **ENTERED:**

**DATE:**     **December 3, 2019**             _____
                                                      **HON. MARIA VALDEZ**
                                                      **United States Magistrate Judge**